Nkenganyi v. Merrick Garland And we have both counsel appearing by video this morning. Ms. Beach Oswald, when you're ready, please go ahead. Thank you, Your Honor. May it please the court, I represent the petitioner who is from the southwest region of Cameroon. And this is, he's specifically from Uyukabuya, and he was denied asylum by the immigration judge and the Board of Immigration Appeals. Cameroon is currently this year been designated by the Department of Homeland Security as for temporary protected status. It is a situation here where Mr. Fidelis Nkenganyi had a plethora of problems to his family. He had four arrests, he had searches, he had harm, he had hospitalization, and he had additional problems where his brother was shot. So when the judge talks about candor and credibility, I think basically, as we mentioned in our brief, there's an issue here about whether or not she could hear him. Because as we mentioned, there was 62 times where she asked him to raise his voice due to technical difficulties. And so maybe it was a volume issue rather than an issue of whether or not she was sure he was anglophone. His testimony shows that he's an anglophone teacher with an anglophone name, first and last name. His parents are anglophones. In the credible fear interview, which is the interview that occurs at the border, he clearly stated the same thing. And his schooling, however, was mostly in the French area, in Douala, and that's his secondary school teaching and his teaching and all of that was in Douala, which is the Francophone area. Thus, he spoke French fluently as well as English. It doesn't change the fact of identity of being an anglophone, which is based on the village you come from and your name and the place of birth and your family and your tribal and your language and the languages you speak. I'm sorry to interrupt. Just to clarify one point, did the immigration judge determine that he was not anglophone based on the difficulty he had understanding the proceedings in English, American English? No, she did not. She did not. She found that she was confused, I think, to some degree because he said he spoke fluent French and so therefore she questioned how was he an anglophone, even though that was clearly brought out in both the credible fear, his testimony, his affidavit, the affidavits of his family, and clearly that he was from the Southwest, specifically from the BLM area, Boya, which is currently villages have been burned, hospitals have been burned. A lot of the area has been destroyed and people are living in villages and out in the forest. So that is supported by all country condition documents as well as the designation of TPS. The anglophone area, which is the Southwest, which he's from, has been particularly targeted as well as the Northwest. So there were multiple incidents and I think this was part of the problem is not only his arrest, but there were other incidents such as the September, 2017, September, 2018. And the trauma of these myriad details and recollections and plethora of problems and the searches of his home are all mentioned in the credible fear in his affidavit. He did not talk specifically about the searches because he was not asked about that on his testimony. But when you look at the totality of circumstances and the evidence supporting of his wife and his brother who was shot in the leg and all of the other evidence that has been submitted, including his medical, it's clear that this person has suffered past persecution and certainly what's troubling is he certainly has a fear of returning, a well-founded fear of returning. One of the issues that was brought up was about the 2017, whether or not he'd brought it up before and they said, even in the government's brief, it says he did not. It's clear from the credible fear 588 that he did, in fact, bring up the September, 2017. And even though there were some other things that he said, at that point on that testimony, the officer specifically says, I'm confused. So she's not clear on which event he's talking about, I think, and that led to some confusion. There was also what some inconsistencies, they said, well, did he become a head teacher or was he just a teacher? Well, teacher or head teacher, honestly, in the scope of things, it doesn't really make much difference, but he specifically said in his affidavit that he was a head teacher, became that at the end. He said 2017, it was actually 2018, according to the attestation of his employer. He also said that in his credible fear at the border that he was a head teacher. So he has been very consistent. I think the problem, as I said, is all the details and all the recollections and all the myriad of events could have created some confusion. Could I interrupt you here and ask, I think you're arguing that the immigration judge made faulty credibility determinations, but what is the highly probative evidence that the IJ failed to consider that would justify sending it back to them? I think that she did not consider the country conditions. She did not consider specifically that the evidence of his past persecution of these arrests and what happened in his beatings or his well-founded fear future persecution, which certainly should have been the critical point of her consideration for an asylum case. Some of the omissions, one of the omissions on his wife's affidavit, it doesn't really go to credibility. Some of the language is misinterpreted, like he specifically says, like the employer says he was in the past tense a teacher. In one letter she says he became head teacher, the others he doesn't. I don't see that as an inconsistency. Each of those documents were written for different purposes. One was to talk about the arrests and the problems he's actually had. The other one was an attestation of his employment. So in the scope of things- Can I ask, I'm sorry to interrupt. As I understand it, his wife's affidavit, brother's affidavit and headmistress all independently alleged that he was tortured, detained. They have independent allegations for his CAD claim. In your view, did the BIA, did the agency adequately review this independent evidence, even if it found him incredible in his own testimony? I don't believe it did. I don't believe it reviewed it carefully. I don't believe some of the discrepancies mentioned are not even there. I don't believe that they, obviously each affidavit is not gonna be a duplicate of each other. They are going to talk about things that they knew, but each of the person's affidavits spoke specifically about the arrests that he'd had and the searches and the incidents that they recalled. Now, whether or not they listed every single one, that's another issue, but they would recall what they recall and they would write about what they knew. And all of them talked about the arrests. All of them talked about the searches. All of them talked about things that had happened to him that corroborated his story. And as I recall, I don't believe the immigration judge weighed the reliability of those independent affidavits. They were used rather or discussed in the context of finding inconsistencies in his own testimony. Do I have that correctly? Absolutely, Your Honor. But the immigration judge, as I went through the decision, didn't just simply list the evidence that was presented, but went affidavit by affidavit and explained what she considered to be the problems with whether this would support his claims. So I'm not sure. I'm having a hard time figuring out what more the immigration judge was supposed to do. It's impossible on this record to say that the immigration judge was unaware of this evidence or didn't consider it or didn't discuss it, or didn't discuss it in detail because the immigration judge did all of those things. So why does that mean that the immigration judge didn't consider this evidence? How do we reach that conclusion? I don't think she considered the past persecution of the arrests and the consistency and the huge amount of consistency and the totality of circumstances of both the credible fear of his testimony, of his affidavit, and of all the corroborating documents. Okay, I want to make sure. I'm sorry, I want to make sure I heard you because you cut out for just a second. You're saying the immigration judge didn't consider this in the context of past persecution. Is that correct? Is that what I heard? Correct. Okay, but for example, with his wife's affidavit, the immigration judge analyzed for at length that it was unclear that she could have even encountered the police because she was supposedly in hiding and then his testimony about whether she moved. And that was all relevant to future persecution, whether the police were still looking for him. Right, so I mean, the immigration judge certainly looked at this with respect to future persecution. On the wife's affidavit, the only omission she mentioned was that why had the wife said she was in hiding? Well, the wife actually does mention that, you know, the house was burned down, that she heard that her house was burned down. How would she hear about this if she was living in that house? But wasn't the IJ's point that how would the police come and interview her and look for her husband if she wasn't there, if she was in hiding? Well, I think there's a timeline here. There were other times where they did come and they did interview. I think that there were multiple incidences of where that happened. So when he had left and was also in hiding, so I don't know that his recollection was accurate as to when he spoke to her or what he remembered that she knew. What she testified to is what she knew about what he had suffered in the past and the arrests that he had gone through. I guess, but that's my earlier point, which is it seems as if the immigration judge discussed the wife's affidavit in the context of saying, how can it be that you testify that she's in hiding when her affidavit says that the police arrived? It's, I don't recall seeing the immigration judge discussing the wife's own testimony that he was severely beaten by the military, hospitalized, threatened by the AMBA boys, kidnapped by them. Did the immigration judge actually address the wife's affidavit in the context of his cat claim and whether he was tortured or not? No, she did not. She addressed, she cherry-picked certain inconsistencies of or omissions in different things as she perceived them. And I think all of it was tainted by the fact that she didn't really understand why he spoke French and therefore she had doubts to start with. And clearly if she had done a Cameroonian cases, I mean, it's quite clear what the names are and the tribes and all of that and the areas and how you identify and the PSG of a Anglophone Cameroonian and especially teachers who have been multiple teachers in the Anglophone area are constantly being arrested. So she didn't address any of that at all. She only had cherry-picked inconsistencies which you can find in any asylum case. Anybody can find some kind of inconsistency in any story. And I don't think her inconsistencies arose to address anything that detracts from his past persecution and what he went through and all the beatings and harm he suffered. So if we- I'm sorry, we're well over time, but Judge Lefkoe has a question for you. Couple of things. If we accept that all the harms that are testified to either in the affidavits or his testimony are true, it seems to me that the judge is still saying that this doesn't rise to the level of torture. So how do you measure what is torture in the context of immigration law? I mean, as you know, I'm a district judge. I don't deal with these cases on a regular basis. It's a one in 10 possibility of persecution under Cardozo, the Supreme Court case. It's not a probability standard like in criminal or for torture, it's a different- Asylum has a much lower burden of proof. And I believe that he has, with the cumulative evidence and the totality of the harm he suffered, certainly in the physical violence under this circuit's law, case law under Eden Wilkinson and other cases, that there's certainly proof that on account of his Anglophone, Cameroonian background and imputed political opinion that was motivating his potential persecutors, the government specifically here, that his life would be in serious danger and harm and based on also the pattern and practice of killing and harming these same exact Anglophone and teachers that has occurred that led to the designation of TGS by the Department of Homeland Security. Okay, all right, so we're more than five minutes over time. So you didn't actually reserve any time for a rebuttal, but I will give you a minute. But on the other hand, in fairness, if the government feels like they need more time, I'm not going to cut you off at 10 minutes. If you're finished with your argument, that's fine as well. But I think we're so significantly over time that there needs to be some balance in the amount of time the parties have. So, Mr. Needle. And may it please the court, this is Jonathan Needle on behalf of the U.S. Attorney General. The central issue in this appeal is whether the record compels reversal of the agency's credibility determination. Here, it's readily apparent that the agency considered the totality of the evidence, and in doing so, identified numerous inconsistencies to support its finding that the petitioner did not provide credible testimony and therefore failed to meet his burden of proof. These inconsistencies undermine the credibility of the petitioner's account of his interactions with separatists in Cameroon, his encounters with government officials, and the way in which these problems impacted his employment. I do want to note at the outset something about the scope of this court's review. So, in this case, it's the board's decision that is under review, the Board of Immigration Appeals. And the board basically found no clear error in the immigration judge's adverse credibility determination. But in upholding that determination, the board addressed most, but not all, of the reasons given by the immigration judge. The board did not address the immigration judge for the credibility determination. Notably, the board did not discuss the immigration judge's findings regarding the petitioner's English language proficiency or his lack of candor to the court. Those were not... Mr. Little, did the board address independent evidence of Mr. Ngekanye's CAT claim? That is, even if the board had affirmed the adverse credibility determinations under our case law, it has to give reasoned consideration to independent evidence of torture. And that seems to me to come from his wife's affidavit, his brother's affidavit, the headmistress, medical records, country report. What consideration did the board independently give to that evidence? Well, with respect to the CAT claim, the board actually did incorporate the analysis of the immigration judge. That's not the case with respect to the asylum and withholding claims, but the board's analysis of the CAT claim was largely deferential to the IJ's analysis. And the IJ concluded that the petitioner had not shown a particularized risk of torture. And in doing so, the immigration judge properly took into account that the petitioner had not provided credible testimony. But the IJ went beyond that and looked at the corroborating evidence, looked at the evidence of country conditions, did not find credible evidence that his family was being targeted in Cameroon. And that relates back to the affidavit that the petitioner's wife provided, which contained a significant discrepancy with the petitioner's testimony. But following up on my earlier questioning, my understanding from reading the record is that the immigration judge addressed the wife's affidavit in the context of finding his statements inconsistent with her affidavit, not addressing the veracity of her affidavit or weighing her evidence, the wife's evidence, independently as to substantiate or not his torture claim. Is there, can you direct me to somewhere in the record that indicates that he, that the immigration judge discussed the wife's affidavit or the brother's affidavit in the context of the CAT claim itself, the claim of torture? I believe the reference here is that the, that there is a reference to the wife's affidavit in the IJ's analysis of the CAT claim in which she, in which the immigration judge finds an issue with the reliability of that affidavit given the discrepancy between the petitioner's assertion that his wife is in hiding and the fact that that information was not included in the affidavit. That there, the IJ's analysis also indicates that the petitioner did not substantiate his, his claim that his wife had to relocate due to government harassment. So the IJ did what it was supposed to do in analyzing the CAT claim. It went beyond the credibility determination and considered the totality of the circumstances to indicate whether the petitioner faced a particularized risk of torture. And the suppositions that the court, that the immigration judge would have to adopt in order to find a particularized risk of torture would involve, you know, the supposition that the petitioner would be mistaken for an opposition fighter by the Cameroonian government. He would be taken into custody and he would be tortured. And the court, the immigration judge found that the evidence, the totality of the evidence did not support a clear probability of torture, which the petitioner would be required to show for CAT protection. I mean, the extent of what I see in the record on, on AR-90 is a line from the IJ's sentence state decision that says the country condition reports and objective evidence do not on their own demonstrate the likelihood that respondent will personally face torture if returned to Cameroon. So it doesn't, you know, that would have been a great place to say, to weigh the evidence, to consider the independent evidence of the wife's affidavit claiming that he was severely beaten by military, and detained, the shooting of the brother, and the veracity of those statements, the headmistress saying that government forces came to his school to search for him, that I'm having a hard time seeing how the board ultimately looked at this evidence, the independent evidence of his torture claim. But if you see anything else, please let me know, because I'm not finding it myself. So what troubles me is that we have the presumption that the agency reviews all the evidence. And typically, if they make a catch-all statement that they've reviewed everything, that's sufficient. And it's only not sufficient if we find that they misstated the record, if we find reasons to believe that they really didn't consider the evidence, including that they misstated the evidence, or that they ignored some particularly probative piece of evidence. But here, the IJ and the BIA actually went beyond that minimal level and didn't just issue a catch-all statement, actually listed and identified by date and from whom various letters and affidavits were submitted, and then analyzed them. So I think what Judge Sanchez's question is suggesting is that something more is required. What more in our case law would be required of the IJ? I mean, where is it that the... I guess the other way to put this is, what is sufficient in this record to show that the agency considered the evidence? That's correct, Your Honor. And there is, under this court's precedent, the court has found that where the petitioner fails to provide credible testimony, then you look towards the objective evidence, including the country conditions reports, to determine whether the petitioner faces a particularized risk of torture. It's clear, going through the agency's decision, or the decisions of the board and the decision of the IJ, that they considered the totality of the evidence. That is abundantly clear in the context of the credibility determination, where the agency identified a litany of problems with the petitioner's testimony. The immigration judge addressed the country condition reports. It referenced the affidavits that the petitioner submitted in the context of evaluating the petitioner's CAT claim. And again, Your Honor is correct, there is a presumption of regularity, a presumption that the agency considers the evidence before it. And there is just no evidence that the petitioner provides to compel a contrary conclusion under this court's deferential standard. I guess, well, what seems clear is that there's a little bit of a difference of opinion about it, because as I see it, the discussion of the affidavits themselves were in the context of finding inconsistencies in his own testimony. If there was an independent weighing of that evidence in the context of the CAT torture claim, there's no discussion of it. So it's one thing to use those statements to ground the finding that he made inconsistent statements. It's another to independently analyze that evidence to determine whether there is a potential or a likelihood of torture. And I'm not seeing the latter analysis even as the former was used. But isn't the issue with CAT, it's the likelihood of, you know, the agency, the IJ made an adverse credibility determination, the BIA affirmed that. And throughout its analysis explained various reasons. And then I suppose the debate is whether it was substantial evidence to support the adverse credibility determination. But going to the CAT claim, as you noted, the agency was required to go beyond the adverse credibility determination and consider other evidence. But the most probative evidence of what the future would hold was these statements that police were still looking for the petitioner, which the IJ discussed at length, how that wasn't supported by the record. So why isn't, you know, why isn't that sufficient for an analysis of the CAT claim? Correct, that's correct, Your Honor. That particular omission from the wife's affidavit is very significant because it goes to the very reason why the petitioner is seeking protection from removal. He's claiming that the government is still looking for him, but he was not able to adequately explain why his wife did not include this crucial bit of information about her having to go into hiding in her affidavit, which is dated very shortly before the merits hearing. The petitioner represented that he spoke to his wife shortly before the hearing. This omission was not adequately explained. And the agency acted within its discretion in discounting that evidence, both in the context of the asylum and withholding claim, as well as in the context of the CAT claim. We've taken you over time. Are there any other questions? No other questions. All right, so Ms. Beach-Oswald, I'll give you a minute for rebuttal. Oh, I'm sorry, you're muted, we can't hear you. Can you hear me now? Yes. Your Honor, it's accurate to say, and I stated this in my brief, is that the BIA woefully failed to analyze his eligibility for either withholding of removal or a CAT. Neither were addressed in the BIA decision. The issue here is whether the amount of harm he suffered is past persecution, and things have gotten far worse with the designation of TPS that proves in itself that Cameroon is harming Anglophones and that the situation is far worse for that. In addition, I would like to say that the case is not based purely on the wife's affidavit. It is based on his own testimony, his credible fear interview, and all of the other evidence, his declaration himself is sufficient, even without the corroborating evidence, to show that there is so much consistency that the few minute details of inconsistency certainly do not, under Ninth Circuit precedent, outweigh all of the consistency and of all the harm he has suffered in this case, Your Honor. And for that reason, we would request that he be granted, that the case be remanded to the BIA and granted asylum. Thank you. Thank you both for joining us this morning. Thank you, Your Honor. All right. So the next case for us.
judges: BADE, SANCHEZ, Lefkow